WESTERN UNION TELEGRAPH CO. v. RIVIERE. (No. 5429.)

(Court of Civil Appeals of Texas. Austin. Feb. 17, 1915.)

1. TELEGRAPHS AND TELEPHONES ☞68—DELAY IN TRANSMISSION—LIABILITY—NOTICE—"PASS."

A telegraph message to Mrs. R. reading: "Come on first train. May pass away at any moment. [Signed] Mrs. W."—disclosed on its face enough to put the telegraph company on notice that some person was ill. The word "pass" has several shades of meaning, one being: "To move beyond the reach of observation, purpose, or action; vanish; disappear; hence to depart from life; die; usually followed by away"—and it was in this sense that the words were used in the message.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 69, 70; Dec. Dig. ☞68.

For other definitions, see Words and Phrases, First and Second Series, Pass.]

2. TELEGRAPHS AND TELEPHONES ☞68—DELAY IN TRANSMISSION OF MESSAGE—SICK MESSAGE—NOTICE.

That a telegram relating to illness did not mention the name of the person who was ill did not prevent it being notice to the company of the nature of the message, and did not relieve it of liability for delay.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 69, 70; Dec. Dig. ☞68.]

3. TELEGRAPHS AND TELEPHONES ☞71 — TRANSMISSION OF MESSAGE—DELAY—DAMAGES.

A verdict for $1,200 for mental anguish from delay of a sick message, whereby plaintiff did not reach her father until 9 p. m., instead of 9 a. m., held excessive, and that it should be reduced to the sum of $600.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 74; Dec. Dig. ☞71.]

Error from District Court, Williamson County; C. A. Wilcox, Judge.

Action by W. P. Riviere against the Western Union Telegraph Company. Judgment for plaintiff, and defendant brings error. Judgment as remitted affirmed.

Geo. H. Fearons, of New York City, and L. A. Hill, of Austin, for plaintiff in error. O. E. Roberts and Amos Peters, both of Taylor, for defendant in error.

KEY, C. J. W. P. Riviere brought this suit against the Western Union Telegraph

Company to recover damages for mental suffering sustained by his wife, Mrs. N. E. Riviere, for the negligent failure of the Telegraph Company to transmit and deliver in proper time the following message:

"Fort Worth, Texas, February 20, 1911.

"Mrs. N. E. Riviere, Taylor, Texas. Come on first train. May pass away at any moment.
"[Signed] Mrs. R. C. Wallis."

There was a jury trial, which resulted in a verdict and judgment for the plaintiff for $1,200, and the defendant has brought the case to this court by writ of error.

The plaintiff alleged and the proof shows that at the time in question Robert F. Wallis, who was the father of Mrs. N. E. Riviere, was very ill at the home of R. C. Wallis, in Ft. Worth, Tex., and that the message was sent by Mrs. Wallis for the purpose of informing Mrs. Riviere of her father's condition, in order that she might come immediately to his bedside. The proof shows that delivery of the message was unnecessarily and negligently delayed, as a result of which Mrs. Riviere did not reach Ft. Worth and the bedside of her father until about 9 o'clock p. m. of February 21st, while if proper diligence had been exercised she would have reached her father about 9 o'clock a. m. on that day. The plaintiff alleged, but the proof fails to show, that the agent who received and undertook to transmit the message was notified of the relationship existing between Mrs. Riviere and the unnamed party referred to in the message; and, because of the failure to prove these allegations, it is contended on behalf of the telegraph company that the plaintiff was not entitled to recover. In other words, the contention is that the language of the message was not sufficient to put the telegraph company on notice of the fact that it was sent for the purpose of apprising Mrs. Riviere that her father was dangerously ill and might die at any time. It was first held by our Supreme Court that a message which did not, upon its face, disclose the relationship of the parties was not sufficient to put the telegraph company upon notice, and require it to contemplate, as a result of the breach of its contract to deliver, that the person for whose benefit the message was sent would suffer mental anguish on account of such breach. In the case of Telegraph Co. v. Adams, 75 Tex. 531, 12 S. W. 857, 6 L. R. A. 844, 16 Am. St. Rep. 920, the Supreme Court repudiated and in effect overruled its former decisions in the following language of Mr. Justice Henry, speaking for the court:

"It seems to be well settled that telegraph companies are not charged with knowledge of the importance of delivering cipher dispatches. As in the nature of things they cannot know the contents of such telegrams, that mode of expression being adopted to keep them from knowing, the rule is a just one that preserves them from the responsibilities that such knowledge would impose on them. There seems to be an effort to extend this rule beyond the occasion for it, and to practically make all telegrams expressed in abbreviated language cipher dispatches. We think a distinction in this respect must be made between messages couched in terms intended to conceal their meaning and such as have no such purpose, but are intended to convey information by the use of no more words than are necessary when given their accustomed meaning. It is well known to the public, and cannot be unknown to the telegraph companies, that the utmost brevity of expression is cultivated in correspondence by telegraph. It is as well known that that mode of communication is chiefly resorted to in matters of importance, financially and socially, requiring great dispatch. When such communications relate to sickness and death, there accompanies them a common sense suggestion that they are of importance, and that the persons addressed have in them a serious interest. It would be an unreasonable rule, and one not comporting with the uses of the telegraph, to hold that the dispatcher will be released from diligence unless the relations of the parties concerned, as well as the nature of the dispatch, are disclosed. When the general nature of the communication is plainly disclosed by its terms, instead of requiring the sender to communicate to the unwilling ears of the busy operator the relationship of the parties concerned, a more reasonable rule will be, when the receiver of the dispatch desires information about such matters, for him to obtain it from the sender, and if he does not do so to charge his principal with the information that inquiries would have developed."

The rule announced in the Adams Case has been reiterated and followed by the Supreme Court, as well as the Courts of Civil Appeals, in many subsequent cases. However, while the underlying principle upon which the rule is based does not seem to authorize it, the Supreme Court has held that the doctrine of implied or constructive notice upon which the Adams Case was founded does not go to the extent of requiring the Telegraph Company to take notice of the fact that some person not mentioned may suffer mental anguish on account of a breach of the contract. Tel. Co. v. Kirkpatrick, 76 Tex. 217, 13 S. W. 70, 18 Am. St. Rep. 37; Tel. Co. v. Carter, 85 Tex. 580, 22 S. W. 961, 34 Am. St. Rep. 826. The fundamental doctrine and underlying principle upon which the Adams Case rests is the doctrine of notice resulting from knowledge of facts sufficient to put a prudent person upon inquiry; and therefore, when a message indicates upon its face that it relates to serious illness and probable death, it would seem, upon principle, to be sufficient to indicate to the telegraph company that the message was sent in order to give some person an opportunity to come to the bedside of the person who was ill. Who that person might be would, in the nature of things, be immaterial to the telegraph company; but if it desired to know it could as readily ascertain that fact as it could the relationship between the addressee named in the message and the person referred to as being ill; and the court held in the Adams Case, and still holds, that telegraph companies must take notice of the latter fact from the face of a message which does not disclose it. But the question involv-

ed in the Kirkpatrick and the Carter Cases is not involved in the instant case.

[1] The points here made are: First, that the message does not disclose on its face, or put the telegraph company upon notice, that any one was ill; and, second, that it does not give the name, or otherwise disclose the identity, of the person who was ill. We have been cited to no case, and have found none, which is similar to this in the respects referred to; but, after due consideration, we have reached the conclusion that the case comes within the principle upon which the Adams Case was decided, and that the message disclosed upon its face notice of the fact that a near relative of Mrs. Riviere was seriously ill, and that a breach of the contract to transmit and deliver the message with reasonable diligence would cause her to suffer mental anguish. It is true that the message does not use either of the words "sick," "ill," or "death"; but, in determining its importance as disclosed by its language, we must consider that, in the first place, it was sent by one woman to another woman, and while that class of persons may communicate by telegraph upon business matters, they are not so likely to do so as men, and if a doubt in that respect exists, it is more reasonable to suppose that the message does not relate to business, but to family affairs. The word "pass" has several shades of meaning, the third, as given by the Century Dictionary, being:

"To move beyond the reach of observation, purpose or action; vanish; disappear; hence to depart from life; die; usually followed by away."

It was in the latter sense that the words "may pass away at any moment" were used in the message here involved; and, considering that language, and the fact that it was a communication from one woman to another, we think that any person of ordinary prudence would naturally suppose that it was intended to inform the addressee that some person was seriously ill, and therefore it constituted sufficient notice in that respect.

[2] As to the second point, while it is true that the message omits the name of the person who was ill, still we see no reason in principle why that omission should relieve the telegraph company from liability. It must necessarily be construed as referring by implication to some person who was seriously ill. The name of the person referred to by implication was wholly immaterial to the telegraph company, otherwise than it might enable it to ascertain the relationship existing between that person and the addressee, or person for whose benefit the message was sent; and the doctrine is well established by the Adams Case and other decisions that if the telegraph company desires information as to such relationship, it becomes its duty to make inquiries, and therefore it is charged with notice of the facts it might have ascertained. It has been repeatedly held that the

mere mention of the Christian or baptismal name of the person for whose benefit the message was sent, or the person who was ill, is sufficient. For instance, in the Adams Case, supra, the message was addressed to F. E. Adams, but it read: "Clara, come quick, Rufe is dying." There, the beneficiary was merely designated as "Clara" and the sick person as "Rufe," which, in so far as the telegraph company was concerned, did not identify the person for whose benefit the message was sent, or the afflicted person from among a large number of persons named Clara and Rufe. Then in reason what difference can it make to the telegraph company whether the sick person's name is incorporated in the message or not? In the case at bar the afflicted person was named Robert F. Wallis, and if the message had read, "Robert may pass away at any moment," while it might have been confusing, if not misleading, as to Mrs. Riviere, for whose benefit it was sent, the mere mention of the name "Robert" would have constituted sufficient notice as to the telegraph company; and if it desired to know what particular Robert was referred to, and his relationship to Mrs. Riviere, it would have been its duty to have made further inquiries upon that subject. Hence we overrule the contention urged on behalf of the telegraph company, and hold that upon its face the message constituted sufficient notice of the fact that the father of Mrs. Riviere was seriously ill.

[3] We decide against the telegraph company on all the other points presented in the brief, except the contention that the verdict is excessive. Upon that point we copy from the brief of the telegraph company the following statement, conceded to be correct, and we also copy the additional statement contained in the brief of the other side:

From plaintiff in error's brief:

"The verdict of the jury and judgment in this case is for the sum of $1,200. The only injury shown, if plaintiff is allowed to recover, would be for failure of the plaintiff's wife to reach the bedside of her father about 12 hours before she did. The uncontroverted testimony shows that Mrs. Riviere reached the bedside of her father about 9 o'clock p. m. February 21, 1911, and that her father died on the morning of February 25, 1911, over three days after she had reached Ft. Worth. The witness Mrs. R. C. Wallis testified that Robert F. Wallis was conscious on the morning of February 21, 1911, but did not remember whether or not she had any conversation with him on that day after 9 o'clock. Mrs. W. B. Owen testified that Robert F. Wallis was conscious on the morning of February 21st from 9 o'clock to 12 o'clock; that Mrs. N. E. Riviere arrived the night of February 21st, somewhere between 8 and 9 o'clock p. m. 'I was in the room with Robert F. Wallis at the time Mrs. Riviere entered the room. Mrs. Riviere came in the room and spoke to him and kissed him, and said, "Papa, this is Nann." I think at first he recognized her, and then called the name "Nann." I do not remember the exact words he stated, but they were irrational. He said "Nann and May," and then I knew he did not know what he said. He continued, "the black and the white shall all be alike in Heaven." He sometimes called her

Mrs. Riviere, his little black girl.' Cross-examination: 'Yes; it is true that on the night of Mrs. Riviere's arrival Robert F. Wallis said "that he hoped and prayed that Wellie would get here." I believe that I had forgotten that. Wellie is my brother. Mrs. Riviere is darker complexioned than I am, and is what you would call a brunette.' "

"R. C. Wallis testified: 'I am the brother of Mrs. N. E. Riviere of Taylor, Tex. For short the family call her "Nann." My father [Robert F. Wallis] grew worse on the afternoon of February 21st. I cannot recall that I had any conversation with him on the afternoon of February 21st. I do recall that I conversed with him on the morning of that day after 8:10 a. m. He recognized me as his son. On the night of February 21st, after 8:30 o'clock, my father was very ill. He was unconscious practically all the afternoon and night of February 21st. I am sure that he did not have anything further to say to me after 9 o'clock p. m. February 21st. My sister Mrs. N. E. Riviere arrived on the Missouri, Kansas & Texas, due at Ft. Worth at about 8:45 p. m. February 21st, and got to the house about 9 o'clock. The only signs of recognition was that he said "Nann and May, the black and the white, we shall all be alike in Heaven, God bless them." The only thing I can recall in the way of conversation after 9 o'clock p. m. on February 21st was what I stated in the telegram to my brother, "that he hoped Wellie would come." He made that statement at the time Mrs. Riviere came, probably a half minute after she entered the room. My father died the morning of February 25, 1911, at about 3:30 a. m. Mrs. Riviere of Taylor arrived on the night of February 21st, at about 9 o'clock p. m.'

"Mrs. N. E. Riviere, wife of plaintiff, testified: 'At the time I reached my father's bedside I considered his condition as irrational the moment he spoke. My sister Mrs. Owen said, "Papa, here is Nann." As I went into the room she said, "Papa, Nann has come." I went to the bed, and he reached his arms up and said, "God bless you." There was no rationality whatever in his eyes. I have heard the evidence about what he said about the black and white; that was simply a mumble; it was very indistinct. Never after that time was he conscious at any time so that I could hold a conversation with him. There was one question I said, "Papa how are you?" He never answered me, and never knew me from that minute.' Cross-examination. 'My father's home was at Bellbuckle, Tenn., until a short time before he came to Ft. Worth. He had been on a visit to his other daughter, Mrs. Owen, at Dallas. Wellie is my brother, known as C. W. Wallis, and his pet or family name is "Wellie." Yes, sir; he is the person referred to where some one spoke about him and hoping Wellie would come.'

"Mrs. R. C. Wallis testified: 'His [Robert F. Wallis] mind was clear up to February 15, 1911. On February 15th was the first time I noticed him saying anything to cause me to think he had unconscious moments. After February 15, 1911, he was conscious at times, and he was conscious on the morning of February 21, 1911.'

"R. C. Wallis testified on cross-examination by plaintiff: 'My father, Robert F. Wallis, at that time was very ill. A very sick man. He rested very little on the night of the 20th. I was up with him practically all night. I talked with him on the morning of the 21st. I remember the conversation I had with him, and that I was speaking to him about Mrs. Riviere coming in on No. 6 train that morning. I had not been carrying on a conversation with him, as he was not able to converse as he was very weak, and at times he appeared to be conscious, and at times he did not.' "

From defendant in error's brief:

"Mrs. Robert C. Wallis further testified: 'I waited on him [referring to Robt. F. Wallis] very little after his daughter from Dallas arrived, but up to that time I had full care of the case. Mrs. Owen of Dallas arrived on February 17th. On the afternoon of February 21st I passed in and out of the room in which he was sick, but was not alone with him that afternoon. On that day his sickness was growing decidedly worse. His condition for the worse changed on Monday, February 20th, somewhere between 2 and 2:30 p. m. The doctor said he had changed decidedly for the worse; positively no hopes for him. I then phoned a message to the Western Union Tel. Co. This was Monday, February 20th, between the hours of 2 and 2:30 p. m.; cannot exactly state the minute. I sent the message immediately after the doctor left, and he made his call between 2 and 2:30 p. m. I phoned to the Western Union at Ft. Worth, Tex., to have the telegram sent to Mrs. N. E. Riviere at Taylor, Tex.'

"Mrs. W. B. Owen testified, in addition to the evidence that has already been copied, as follows: 'I arrived on Friday, February 17, a week before he died [referring to Robt. F. Wallis]. I waited on him while he was sick, and devoted every minute of my time from the time I came; never went out of my room, only to eat. The condition of my father, Robt. F. Wallis, when I first arrived on the date above named was that he was asleep when I first came. I sat down by his bed, and we did not realize that he was so very sick; that is, I did not think him serious or dangerously ill until Monday morning. To the best of my knowledge, his mind was clear when I arrived, and I had conversation with him from the time I arrived up to February 21st. I do not remember anything particular that was said. I know we had conversation, because I was right with him all the time. Yes; Robt. F. Wallis all his life showed a special love and affection for his daughter Mrs. N. E. Riviere. He showed this by often speaking and talking of her, and all his conversation showed that he loved her. Yes; Robt. F. Wallis was conscious on the morning of February 21st, between the hours of 9 and 12 o'clock. Mrs. N. E. Riviere arrived on the night of February 21st, somewhere between 8 and 9 o'clock p. m. I do not know just what time it was.'

"Referring to the language quoted on page 26 of plaintiff in error's brief of Mrs. Owen's evidence, in which she said, 'He then continued, "The black and white shall all be alike in Heaven," ' The statement fails to contain the language following this, which is to the effect that 'his mind was wandering.' After the arrival of Mrs. N. E. Riviere, we were both in the room all the time, only when she went out to attend to some things to be done, but I was in the room all the time. He only manifested signs of consciousness after the arrival of Mrs. Riviere up to the time of his death for a moment or so. After the arrival of Mrs. N. E. Riviere I do not remember anything of his having expressed any desires for anything or anybody. Yes; there were frequent communications between Robert F. Wallis and Mrs. N. E. Riviere, of Taylor."

"Robert C. Wallis further testified: 'After the night of February 21st, my father sank very fast. Each night we saw a great difference. His worst hours were in the afternoon, night and morning. In the daytime he seemed to get a little better. The only thing I can recall in the way of conversation after 9 o'clock p. m. on February 21st was what I stated in the telegram, "that he hoped Wellie would come." He made that statement at the time Mrs. Riviere came, probably a half minute after she entered the room. He then sank back on his bed after he made that statement, and had nothing fur-

ther to say so far as I know. Only at times when he was irrational he would live over his childhood days, speak of his younger brothers, etc. He did not discuss any business affairs after February 21st.'

"Dr. James Anderson, who attended Robt. F. Wallis in his last sickness, testified as follows: 'My name is James Anderson. I am a physician, and was a practicing physician during February, 1911, and on February 14, 1911, was called professionally to attend Robert F. Wallis, and attended him until February, 24, 1911. His sickness started in with la grippe, and had chronic Bright's disease. He also had dilated heart. He kept up pretty well until about February 20th. On the last-named date he showed bad symptoms, his pulse and breathing seemed to be greatly affected. He was conscious and his mind clear on February 20th. On February 21st his mind was clear in the morning when I was there, and began to be a little cloudy at night. On February 21st, I visited him, probably anywhere from half past 9 to 11 o'clock a. m., and in the afternoon I visited him between 6 and 7 o'clock p. m. Yes; I had noticed that his mind began to be cloudy on the night of February 21st. I visited him on the next morning of February 22d, and I visited him every morning and evening at about the same time, as above stated, about half past 9 and 11 o'clock in the morning and between 6 and 7 o'clock at night.'

"Mrs. N. E. Riviere testified: 'Most positively I tried to talk to him after that time [the time of her arrival at her father's bedside] time and again, but never succeeded in getting any intelligent conversation or expressions from him. I was with him all the time I possibly could be from the time of my arrival to the time of his death. If the message in suit had been delivered to me on the preceding afternoon, I would have proceeded at once to my father's bedside. On the afternoon of February 20, 1911, I was at Taylor, Tex. My occupation is teacher of music in the public schools, and this is my fifth year in succession in that business. I have lived in Taylor 21 years, and am well known in that place. I was at school; passing from one classroom to the other, when the message was delivered to me. The relationship between me and my father was as close as ever such relation was between father and daughter, and such relation had been close and intimate all my life from the time I could ride on the saddle in front of him to the woods to cut logs or trees (he was a sawmill man, and my mother was an invalid during my childhood), and there were not many days, I suppose, that the weather was fit for me to go that I didn't go with him. We moved into town when I was 9 years old. My brother had left home, possibly about the time I was 12, and being 10 years older than I. By being deprived of the right to be with my father on the morning of February 21st, I felt that it is something that can never be repaid in any way, shape, form, or fashion. My feelings were decidedly injured. I suffered mental anguish from being deprived of the right to be with him at that time. He died on February 25, 1911.' "

This being the condition of the record, it seems to us that the jury must have been improperly influenced by sympathy, or some other improper motive, when it assessed the damages at $1,200. The proof shows that Mr. Wallis's mental faculties had been impaired for several days before the message was sent; that his condition, both physical and mental, had been gradually growing worse; that at times he was rational and at other times irrational; that when Mrs. Riviere reached his bedside he recognized her, spoke to her by name, even designating her by a pet name used exclusively by him. According to the testimony of his son, who was a witness for the plaintiff, if there had been no delay in the delivery of the message, and Mrs. Riviere had reached the bedside of her father 12 hours earlier, it is not probable that he could have engaged in any extended and satisfactory conversation with her, if it be conceded that his mental faculties would have permitted it, for the reason, as stated by the witness, "he was not able to converse, as he was very sick, and at times he appeared conscious and at times he didn't." Her father did not die until three days after the arrival of Mrs. Riviere, and the only grounds upon which recovery is sought is compensation for the mental anguish suffered by her on account of the fact, as alleged in the petition, that she did not reach his bedside until he became unconscious, and was denied the consolation of conversing with him before his death. We think the proof shows that she has the consolation of knowing that her father recognized her when she arrived, and knew that she had come to him in the hour of his extremity. It was not shown that she desired to make any important communication to her father, the failure to do which placed a burden upon her heart; and, while we concede that she is entitled to some compensation for the breach of the contract which prevented her from reaching her father's bedside earlier, we think the amount awarded by the jury is so unreasonably large as to make it the duty of this court to interfere. Under the statute it becomes our duty to give an opportunity to remedy the error complained of by a remittitur; and therefore the plaintiff in the court below, who is defendant in error here, will be allowed until the 3d day of March, 1915, in which to file a remittitur of $600, in which event the judgment will be affirmed for $600; otherwise the judgment will be reversed and the cause remanded for another trial.

Remittitur of $600 was filed, and on March 3, 1915, the judgment was affirmed for $600.